DETROIT UNITED RAILWAY *v.* BOARD OF STATE
TAX COMMISSIONERS.

1. STREET RAILWAYS—TAXATION—CONSTRUCTION OF FRANCHISE—
REAL ESTATE—FIXTURES.

Relator street-railway company, by the terms of its franchise
from the city of Detroit, was to pay to the city a percent-
age of its gross earnings, and also such taxes for municipal
purposes as might be levied "upon the lots and parcels of
land, and buildings thereon," which were the property of the
company; the same to be in lieu of all other taxes and charges.
At the time such provision was incorporated, relator's cars
were operated by animal power; but subsequently the motive
power was changed to electricity, and a large amount of
machinery was installed for that purpose. At such time, also,
the general tax law declared that, for the purpose of taxa-
tion, real property should include all lands within the State,
and all buildings and fixtures thereon and appurtenances
thereto, unless otherwise expressly provided by law. *Held,*
that relator was not exempted from taxation on so much of
its machinery as constituted fixtures.

2. SAME.

Where an electric-railway company installed ponderous boilers,
engines, dynamos, etc., in its power house for the purpose of
generating electricity, and its superintendent testified that it
was intended that such machinery should so remain until it
should become worthless, either from wear or because of the
discovery of improved appliances, such machinery was
properly regarded as fixtures, and taxable as real estate,
though apparatus had been erected whereby it might be re-
moved without materially injuring the building.

3. TAXATION—MUNICIPAL CORPORATIONS—AUTHORITY OF BOARD
OF STATE TAX COMMISSIONERS.

Under the charter of Detroit, after the general assessment rolls
have been confirmed by the common council, it is made the duty
of the board of assessors to spread thereon the taxes ordered
to be raised for city purposes, and to make copies of such rolls,
and on such copies assess the State and county taxes. *Held,* that
the authority of the board of State tax commissioners, created
by Act No. 154, Pub. Acts 1899, to review and correct assess-

ments, extended to the original assessment rolls, and was not limited to the rolls for State and county taxes. *Board of State Tax Com'rs* v. *Board of Assessors of Grand Rapids,* 124 Mich. 491, followed.

*Mandamus* by the Detroit United Railway to compel the board of State tax commissioners and the board of assessors of the city of Detroit to reduce an assessment. Submitted October 20, 1903. (Calendar No. 20,013.) Writ denied March 23, 1904.

*Brennan, Donnelly & Van De Mark* and *Corliss, Andrus, Leete & Joslyn (John J. Speed,* of counsel), for relator.

*Timothy E. Tarsney,* for respondents.

MOORE, C. J. This is an application for a writ of *mandamus* to compel the board of State tax commissioners to set aside an order made by them increasing the assessed valuation of relator's lands and buildings in the city of Detroit, and to order the assessors of the city of Detroit not to extend a tax against the lands and buildings of relator for the year 1903 according to such increased valuation.

It is claimed in the petition that, by virtue of certain ordinances referred to therein, the machinery used by relator in the operation of its lines of railway by electrical power cannot be placed upon the assessment rolls for taxation for municipal purposes, and that it has not heretofore been assessed. The respondents filed an answer to the petition, in which, among other things, the following is stated:

"These respondents deny 'that, by the terms of said agreement, the machinery used by your petitioner and its predecessors in the operation of its lines of railway by electrical power cannot be placed upon the assessment rolls of the city of Detroit for taxation for municipal purposes,' and aver that said machinery is properly assessed and assessable as a part and portion of the land and buildings

136 MICH.—7.

owned and occupied by said relator, and to which said land and buildings said machinery is affixed in a permanent manner; that said ordinances referred to and set out in said relator's petition, nor any of them, did not and could not have included said machinery as a part of the personal property of said relator or its predecessors, for the reason that, at the time of the adoption of said several ordinances referred to therein, the entire system originally known as the Detroit City Railway, the system known as the Ft. Wayne & Elmwood Railway, and the system known as the Grand River Street Railway were conducted and operated by animal power, and so continued to be operated up to and including some portion of the year 1893, and in some instances to a later period; that during the year 1893, and thereafter, said several lines of street railway were entirely reconstructed, rails of greater weight were substituted and laid in place of the lighter ones upon which the horse cars were operated, electricity was introduced as a motive power, power plants for the purpose of making and supplying electricity by the said several companies, and ponderous mechanical machinery, including engines, boilers, dynamos, and other appliances for the production of electricity, were installed, and said engines, boilers, dynamos, and other machinery were firmly and permanently affixed to the lands and premises of said railway companies, with the intent and design of said several companies, and the officers and managers thereof, at the time of the installation thereof, that said machinery should be and remain a permanent fixture annexed to the lands of the said several companies, and the buildings thereon, and that there has been no actual or constructive severance thereof since said time of installation; and that the same has remained, and now is, a part and parcel of the real estate to which it is affixed, and should be, and is, properly assessed as such. * * * And, further answering, say that the machinery now treated as real estate is only such as is permanently affixed to the lands and premises, and which cannot be removed therefrom without injury thereto, and which, as hereinbefore stated, it was the intent and design of the said railway companies to be affixed thereto, and to remain a part thereof permanently; that there is a large quantity of appliances which may properly be designated machinery, such as electric motors, etc., which is not included in said assessment as real estate, but is treated as a part of the personal property of said relator, and valued as such. * * *

"They deny that the said increased assessment was made up solely of the value of said machinery used in connection with the power houses, as therein stated, but state that the increase on lot 8 and part of lot 9 from $62,920 to $382,400 was not only upon the machinery affixed thereto, but upon the valuation of the buildings thereon; and they aver that said machinery is in law and in fact a part of the real estate, and that the same is so constructed and installed that it cannot readily be removed without in any way injuring the land or the buildings thereon; and they aver that while it is true, as stated in said paragraph, that said petitioner has removed in the past parts of said machinery from one power house to another, they deny that it was done without affecting in any way the value of the premises or the buildings thereon; that the power house of the Ft. Wayne & Elmwood (the Ft. Wayne & Belle Isle) Railway was located on Clark avenue when said system was a separate entity, but that, when the Detroit Citizens' Railway Company acquired the same, said power house was dismantled and the machinery transferred to another place, and that such removal so affected the value of the real estate and premises upon which said machinery was located on Clark avenue that the board of assessors of the city of Detroit took notice thereof, and reduced the assessment thereof for that reason; and they aver that said machinery so treated as real estate was intended by said Detroit Citizens' Street-Railway Company to be a part and parcel of the real estate, and that the same is a part of the lots and parcels of land and buildings thereon, within the scope, effect, and meaning of the ordinances referred to and set forth in said relator's petition.    *    *    *

"These respondents, the board of State tax commissioners, deny the allegations contained in the fourteenth paragraph of said relator's petition as therein stated, and aver that they did take into consideration the valuation placed upon the personal property of said relator, and considered and determined that the valuation placed thereon, after deducting the value of said machinery transferred to the real-estate assessment, was not too high, and that the valuation of the personal property of said relator, excluding said machinery now remaining on said assessment roll, is, in the opinion of these respondents, a fair and just valuation of the said relator's personal property."

Upon the filing of the answer, this court directed the

taking of testimony before a special commissioner, and that testimony is before us.

The ordinance under which the relator is operating provides for the payment to the city of Detroit of a percentage upon its gross earnings. It also has these provisions:

"SEC. 2. From the 1st day of July, 1882, to the end of its franchise under the ordinance approved November 14th, 1879, the said railway shall also pay the city of Detroit such taxes for municipal purposes as have been up to this date, and shall be thereafter, levied and assessed upon the lots and parcels of land, and buildings thereon, which are the property of the said railway. Such taxes shall be levied and assessed in the same manner, and shall be payable at the same time, as other city taxes on lands."

"SEC. 4. The above-mentioned percentage payments, and the tax on lands provided for, to accrue from January 1st, 1887, to the end of the franchise of said railway, are to be paid by said railway and received by the city in lieu of and in discharge of all taxes, license fees, and charges of any kind against the property, capital stock, rights, and privileges and franchises of said company which have been or may be levied, assessed, or imposed under any present or future law or authority."

The general tax law in force when the ordinance was adopted, and in force now, has the following among other provisions:

"For the purpose of taxation, real property shall include all lands within the State, and all buildings and fixtures thereon and appurtenances thereto, except in cases otherwise expressly provided by law." Act No. 153, Pub. Acts 1885, § 2; 1 Comp. Laws, § 3825.

It is said by counsel that this court has recognized that land may be taxable wholly distinct from the buildings thereon, and wholly distinct from the buildings and fixtures, or from either one of the two (citing *Lefevre* v. *Mayor, etc., of Detroit*, 2 Mich. 586), and that applying this principle to the language used in the ordinance requiring the relator to pay taxes for municipal purposes "upon the lots and parcels of land, and buildings thereon,

which are the property of the said railway," indicates an intention between the city and the relator, which should be respected, to exempt the fixtures from taxation. We do not draw the same conclusion from *Lefevre* v. *Mayor, etc., of Detroit, supra,* reached by counsel. In that case it was held that a statute providing that all houses of public worship should be exempt from taxation did not exempt the land from the payment of a paving tax.

At the time the ordinance was granted, the motive power employed for running the cars was horses. The fixtures attached to the barns and other buildings owned by the company would be of little value. There is nothing in the ordinance, when viewed in the light of the surrounding circumstances which existed when it was passed, indicating that the city and the company expected that fixtures attached to the buildings owned by the company would be exempt from taxation.

The relator insists that the increase in the assessed valuation of the real estate was brought about by adding thereto machinery which was personal property, and not properly taxable as real estate. It is contended that the boilers used in the generation of steam, the engines used to drive the dynamos, the dynamos used to generate electricity, the batteries used for storing it, the boosters, the switchboards, and other machinery, are none of them real estate; citing several cases, and among them *Newport Illuminating Co.* v. *Assessors of Taxes,* 19 R. I. 632 (36 Atl. 426, 36 L. R. A. 266), which is said to be a parallel case.

In the power house, at the top of the iron columns which support the roof, there is a projection which allows laying thereon an iron beam on each side of the building, and running lengthwise of it. These two beams or girders are technically called "I beams," and may be said to form a wide railway track,—that is, a track as wide as the building,—upon which is operated what is called a "crane." This crane may be said to be a sort of a car, whose wheels run upon the tracks just described. This car has blocks

and tackle and other appliances for lifting and holding heavy machinery. These blocks and tackle, by means of pulleys, are moved from side to side, as may be found necessary to be brought immediately over any piece of machinery to be removed. The tackle and hoisting apparatus is then fastened to the piece of machinery, which is then lifted up and carried across the building by the crane or car to the doorway, out of which it is taken. This was put in to facilitate the handling of the machinery, and it is said that, as the machinery can be taken out without injury to the building, it is personal property. The boilers occupy a space of 25 or 30 feet square, and are 16 or 18 feet high. They are suspended upon boiler frames set upon piers built up from the concrete floor, and are inclosed with a brick wall, 12 to 14 inches thick, upon three sides, the front of the inclosure being of iron. Some of the engines develop 1,200 horse power, are 30 feet long, 20 to 28 feet wide, with flywheels that weigh 20 tons each. The engines, dynamos, and other machinery are large and heavy; some of them, in addition to their weight, being held in place by bolts.

We have examined the cases cited by counsel. In *Newport Illuminating Co.* v. *Assessors of Taxes, supra*, it appears that the statute of Rhode Island differs from ours in relation to assessments. Under the construction given to it by the courts, it is held that dynamos removable at pleasure, by simply unscrewing bolts, and without doing injury to the freehold, come under the provisions of section 11, which provides that "machines of all sorts, propelled by steam or water power," should be classed as personal property for purposes of taxation. Pub. Stat. 1882, chap. 42. Our statute has no such provisions. It was also held that switchboards that can readily be removed without injury to the real estate come within the provisions of the same section.

Mr. Dupont, a witness for the relator, superintended the construction of the power house, and caused the machinery to be put it. On the cross-examination, in addition to other testimony, he said:

"*Q.* You did intend that machinery that you put in there—engine and boiler, generators, and other appliances—should continue to be used to produce power for the system that you operated, so long as it lasted, or until new appliances were discovered to take its place?

"*A.* Yes; which would produce power cheaper.

"*Q.* With the exception of that limit, it was intended to be permanent?

"*A.* Certainly; yes."

The relator was then the owner of the land and the buildings, and put into them this ponderous machinery, with the intention that it should remain, as stated by Mr. Dupont. Without going into details, we are satisfied that, as to the most of this machinery, it was properly assessable as real estate. See *Wickes Bros.* v. *Hill*, 115 Mich. 333 (73 N. W. 375); *People* v. *Jones*, 120 Mich. 283 (79 N. W. 177).

It is suggested that, when this machinery was put in, it was expected that in time it would be supplanted by improved machinery, and provisions were made to make it practicable to remove it, and for that reason it is not to be regarded as real estate. We do not see how this differs in principle from the expectation that any manufacturer has to replace his machinery when it has outworn its usefulness, either because it is worn out, or because of improvements made, making new machinery indispensable if he is to compete with manufacturers who do use the improved machinery.

The respondents return:

"That the machinery now treated as real estate is only such as is permanently affixed to the lands and premises, and which cannot be removed therefrom without injury thereto, and which, as hereinbefore stated, it was the intent and design of the said railway companies to be affixed thereto, and to remain a part thereof permanently; that there is a large quantity of appliances which may properly be designated machinery, such as electric motors, etc., which is not included in said assessment as real estate, but is treated as a part of the personal property of said relator, and valued as such."

We are not able to say from the record that this return is not true.

It is said ( and we quote from the brief of counsel ):

" The city charter of Detroit provides for a board of city assessors, and makes it their duty to assess ' all the real and personal property subject to taxation by the laws of the State.' Section 163, Compilation of 1893 [Local Acts 1883, Act No. 326, chap. 10, § 2]. By an amendment of the charter approved June 6, 1901 [Local Acts 1901, Act No. 472], it was enacted that the assessment rolls shall be completed on the 1st of April. Provisions are made for a review by the common council and for confirmation of the rolls, ' and, after due consideration thereof, said rolls shall be fully and finally confirmed by said council, and shall remain as the basis of all taxes to be levied and collected in the city of Detroit according to property valuation until another assessment shall have been made and confirmed as above provided.' These provisions, it will be understood, relate to assessments for city taxes.

" By the same amendment last referred to, after confirmation of the assessment rolls, the assessors are required to extend upon the rolls the amount of money which the common council, with the consent of the board of estimates, has ordered to be raised for the next fiscal year for city purposes, and these provisions contemplate that the tax rolls will be in the hands of the receiver on or before July 1st, when the fiscal year begins. ' All city taxes become a debt against the owner from the time of the listing of property for assessment by the board of assessors.' * * *

" The State may use local agencies for State purposes, and, in the matter of assessment and collection of taxes, the legislature may provide for the assessment and collection of general taxes by local officers, or by officers selected by the State; and, if the State may by its own officers assess property and collect its taxes thereon, it may review the rolls made by the local officers,—the power to revise or review involving the power to make the roll in the first instance. But, while the State may use and confer upon local officers functions for State purposes, it is not equally true that the legislature may authorize State officers to perform duties merely for local purposes. The mayor of a city may, for certain purposes, exercise powers of a State officer; but the State cannot, on the plea that a mayor is authorized to exercise powers in which the State is inter-

ested, appoint the mayor of a city, nor authorize a State officer to perform the duties of the mayor.   The State cannot select the assessors of Detroit merely because their assessment may be made the basis for State taxation.   There is a general theory that it is the duty of the State to see to it that the local government is maintained, and, this being the duty of the State, it may appoint its own officers to see that it — including the assessment of taxes — is performed. This duty may authorize the State, by proper means, to compel local officers to perform their duties, exercising the discretion and the powers conferred by law; but the difference between compelling the local officer to perform a duty, and the performance of the duty by a State officer, is manifest.   The carrying of the theory to its limits would result in the absorption by the State of all the functions of the local government and its officers.   *   *   *

"The State is not concerned in the making of the assessment for merely local purposes, further than it may be interested in the enforcement of the law of the land, and in respect to which it may resort, not to its own officers, but only to the courts.   The State, as to purely local taxation, has no more authority to interfere with the assessment through State officers than it has to collect the money, or pay it out after collection.

"The copy of the roll prepared for the levying of the State and county tax, up to the time of the equalization of the State and county assessments, may be reviewed by a State official; and, it being the duty of the city assessors to make a copy of their roll for State and county taxes as soon as the city roll is completed, that copy, I submit, becomes and is the only State and county assessment roll, and I submit that the authority of the State board to review should be confined to this State and county roll."

In this connection the following provision of the charter is important:

" It shall be the duty of the board of assessors to make copies of said rolls as finally confirmed by the common council, upon which they shall ratably assess the county and State taxes, as provided by the general laws of the State."   Act No. 472, Local Acts 1901, chap. 10, § 9.

The question presented is not a new one in this State. It was directly involved in the recent case of *Board of State Tax Com'rs* v. *Board of Assessors of Grand Rap-*

*ids*, 124 Mich. 491 (83 N. W. 209), where there is so full a discussion of the principles involved that we do not deem it necessary to attempt to restate them here.   See, also, *Board of State Tax Com'rs* v. *Quinn*, 125 Mich. 128 (84 N. W. 1).

The writ of *mandamus* is denied.

CARPENTER, MONTGOMERY, and HOOKER, JJ., concurred.   GRANT, J., took no part in the decision.